## TEXAS & N. O. R. CO. v. MOORE.
### (No. 1217.)

(Court of Civil Appeals of Texas. Beaumont. April 3, 1925.)

1. **Trial** ⬤�searrow352(1)—**Special issue whether any of various things was negligence held reversible error.**

Special issue whether railroad killing a bull was negligent because of any of the things submitted in other issues *held* reversible error under Vernon's Sayles' Ann. Civ. St. 1914, art. 1984a, as not advising defendant by jury's answer thereto in what respect defendant was negligent.

2. **Railroads** ⬤�searrow417—**Submission of issue of negligence in operating train at high speed held error.**

Submission of issue of defendant railroad's negligence in operating at 40 miles per hour a train which struck plaintiff's bull at a crossing *held* error, in the absence of peculiar facts

or circumstances showing the operation of the train at that speed was negligence.

3. **Railroads** ⬤�searrow415(2)—**Liability for failure to keep lookout stated.**

Unless the operators of a train realized the danger of killing animal in time to have prevented striking it, negligence in failing to keep lookout is not actionable.

4. **Railroads** ⬤�searrow443(7)—**Evidence held not to show failure to keep lookout was proximate cause of killing of bull.**

Evidence *held* not to show that failure of train operators to keep lookout was proximate cause of death of bull killed at crossing.

5. **Evidence** ⬤�searrow543(4)—**Witness held not qualified to testify either as to market value of Holstein bull or its intrinsic or actual value.**

In action for value of bull killed by train, witness engaged in cattle business, but not familiar with market for Holstein cattle, and not knowing of any sales thereof, *held* not qualified to testify either as to market value of registered Holstein bull or its intrinsic or actual value.

Appeal from Orange County Court; Ed. S. McCarver, Judge.

Action by R. A. Moore against the Texas & New Orleans Railroad Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded for new trial.

F. J. & C. T. Duff, of Beaumont, and Baker, Botts, Parker & Garwood, of Houston, for appellant.

Bland & Kinard and Holland & Holland, all of Orange, for appellee.

WALKER, J. On December 31, 1921, appellant killed appellee's Holstein bull on one of its crossings at about a mile west of the city of Orange, by striking it with one of its passenger trains, which was being operated at a speed of about 40 miles per hour. At that crossing a public road runs east and west parallel with the railroad track and at a distance of about 60 feet from it. The crossing is made by another road intersecting the public road at that point. The engineer on the train did not see the bull until it ran immediately in front of the engine. The engineer testified that it was necessary at that point for him to give close attention to a signal tower a short distance beyond the crossing, since his road crossed another road at the signal tower, and signals were being given to him for the operation of his train. At the crossing in question the country was level prairie, with nothing to obstruct the view of one approaching the crossing for a mile or more. From the record it does not appear that more than one person lived close to this crossing, but that it was frequently used by the public both day and night. Had the engineer kept a lookout for persons and animals on the public road

running parallel with his road, he could have seen the bull as he approached the crossing. One Eli Landry was driving the bull down the road, but the extent of his testimony was that the bull ran in front of the train and was immediately killed. The only evidence offered on the issue of the value of the bull was that of Mr. Abe Sokolski, who testified as follows:

"My name is Abe Sokolski. I live in Orange county. I have been here 35 years. I have been engaged in the cattle business, actively in it, about 10 years. I know this bull that used to belong to Mr. Rusie Moore that was killed by the T. & N. O. It was a registered Holstein. That is fine stock, about as good, I guess, as you can buy. I would judge the bull was about 4 years old. I know it was immune from tick. It was acclimated to this county. I am not acquainted with the market for Holstein cattle in Orange county at that time, July 31, 1921. There was not any market for Holstein bulls of that character in this county that I know of. I was a practical cattle man at that time. I should judge that the reasonable value of that bull was about $1,250 or something like that.

"I don't know where was the closest market to Orange for Holstein cattle. Oh, yes; there is a market for Holsteins; they have Holstein sales up north, and stuff. They have Holstein herds, some places, in towns where there is a market for them. By my statement of the reasonable value, I mean the value any place. As to what experience I have had in buying and selling and knowing of buying and selling of Holstein cattle, will say—well, not Holstein, but I have bought the other kind, the Brahma, and I will give that much any time for a pure blood Brahma. I have had no experience with Holstein cattle, buying and selling; I have priced them several times, but never bought them. I don't know of any sales to amount to anything of Holstein cattle; I tried to buy one at that fair in Beaumont, and the fellow wouldn't set a price. I was acquainted with this particular bull. I wouldn't say it was pretty wild; I walked up and patted that bull many a time; he was raised right in a dairy; I shouldn't think that he was wild at all. Mr. Moore had had that animal about three and a half years. He bought it when it was a yearling. As to that being the only Holstein bull registered, in this county that I know of, will say I think he has got one more, but most of them died of the tick fever that he brought here. I don't know how many he had. He bought a carload, I know. I think about 7 or 8 out of every 10 that he brought down here died."

On this evidence the court submitted the issues of negligence plead by appellee, under the following questions, answered as indicated:

"(1) Was the whistle on the engine that killed plaintiff's bull blown at least eighty (80) rods from the railroad crossing where the accident occurred, and at such place that the blowing of the whistle gave reasonable warning of the approach of the train? Answer 'yes' or 'no.' "

To this question the jury answered: "Yes."

"(2) Was the bell on the engine that struck and killed plaintiff's bull rung at a distance of at least eighty (80) rods from the crossing where such accident occurred and kept ringing until it crossed the public road at such crossing? Answer 'Yes' or 'No.' "

To this question the jury answered: "Yes."

"(3) Was the train being run at an excessive rate of speed at the time the bull was struck? Answer 'Yes' or 'No.' "

To this question the jury answered: "Yes."

"(4) Did the defendant use ordinary care to discover the bull and avoid striking him? Answer 'Yes' or No.' "

To this question the jury answered: "No."

"(5) Do you believe the defendant was guilty of negligence because of any of the things contained in your answers to former questions herein? Answer 'Yes' or 'No.' "

To this question the jury answered: "Yes."

"(6) If you answer 'Yes' to the foregoing question, then answer this question: Do you believe such negligence was the proximate cause of the loss of the bull sued for? Answer 'Yes' or 'No.' "

To this question the jury answered: "Yes."

"(7) What was the reasonable value of the bull sued for? Answer in figures."

To this question the jury answered: "$1,000."

From a judgment against appellant on these answers, it has prosecuted this appeal.

### Opinion.

[1] The form of question No. 5 constitutes reversible error. Appellant was not advised by the jury's answer to this question in what respect it was negligent. This is violative of article 1984a, Vernon's Sayles' Ann. Civ. St. 1914. Interstate Casualty Co. v. Hogan (Tex. Civ. App.) 232 S. W. 354.

[2] No peculiar facts and circumstances were shown in this case making the operation of the train at 40 miles an hour negligence. Therefore, on the facts of the record, the submission of that issue was error. Railway Co. v. Anson, 101 Tex. 198, 105 S. W. 989; Ry. Company v. Morris (Tex. Civ. App.) 63 S. W. 888; Railway Co. v. Matthews (Tex. Civ. App.) 158 S. W. 1048.

[3, 4] We are inclined to think that the issue of negligence in failing to keep a lookout as the train approached the crossing was raised, but there is no evidence showing that such negligence, if found against appellant, was a proximate cause of the death of the bull. It must appear that the operators of the train realized the danger of killing the bull in time to prevent it before this negligence, if any, would be actionable. While the evidence is not clear, the impression we gather from the record is that the bull was being driven down the public road and suddenly swerved into the other road and attempted to cross immediately in front of the train. In this connection, we cannot refrain from quoting the very persuasive logic we find in appellant's brief:

"If the attorney for the appellee in this case had been a passenger on the train in question, we believe that he, as well as the other passengers, would have agreed with Mr. Delhomme when he stated: 'He didn't have no business looking off the right of way,' and during the period of time that his life and the lives of the rest of the passengers were intrusted to Mr. Delhomme that he would have insisted most strenuously that Mr. Delhomme continue to watch the track ahead of him and not look for $1,000 bulls which might be parading up and down dirt roads alongside the track. When the writer of this brief was considerably younger than he is now, his ambition was to be not only a pirate and a second Julius Cæsar, but between times a railroad engineer. When not a pirate or leading his conquering legion into battle, he pictured himself leaning out of the cab window, with his eyes fastened on the rails ahead of him, and this boyish picture has made such an impression that it has developed into the idea that the engineer, when driving his steel horse over the rails at 40 miles an hour, with the lives of the passengers dependent on his properly discharging his duties, should look ahead and keep looking ahead, watching the rails and signals and disregarding the passing scenery to the right and left or the antics of a refractory, registered Holstein bull that might suddenly conceive the idea of butting a railroad train off the track.

"If Mr. Delhomme had been watching the bull as it ambled down the road which paralleled the railroad track until it reached the crossing, and then instead of going ahead, it turned and suddenly darted at right angles across the track, he might have failed to see a broken rail, a thrown switch, or a signal of danger, but he would have seen the bull. However, there is no testimony that he could have stopped his train in time to have avoided taking the conceit out of the bull.

"We have several times avoided a personal collision with a bull by hastily ducking under a wire fence or climbing a tree, but unfortunately railroad trains cannot adopt either procedure, and where a bull conceives an ambitious desire to test out his strength with a railroad engine, or prompted by youthful vanity and a desire to impress some young heifer, undertakes to dispute the right of way with a train moving at 40 miles an hour, we are not advised of anything that the railroad engine can do to avoid the impending tragedy, where the bull gives no warning of his intention until he presents himself immediately in front of the oncoming train.

"It is true if the bull had adopted the dueling code and sent his challenge in advance that the train could have remained at Orange until the bull's ardor had time to cool, but apparently the bull was advised of our present penal code, which hangs you for killing your brother in fair fight but permits you to go scot free if you suddenly and without warning assault the object of enmity. This knowledge and these motives may have passed through the mind of the bull, so that instead of sending a challenge to passenger train No. —— to meet him in fair fight at the third crossing, head to head with tails east and west, he decided on the more modern method of a sudden and unexpected assault delivered from ambush.

"All of the foregoing 'bull' is simply for the purpose of suggesting to the court that, while the jury may have found that those operating the train did not use due diligence to avoid striking the bull, we submit that in view of all the surrounding circumstances and conditions they would have been hard put to it to have advised what could have been done to have avoided the collision. They blew the whistle and rang the bell; there was not sufficient time to use moral suasion or build a track around the bull. The present equipment of railroad trains does not permit of their going around, over, or under, and where a bull makes a sudden, violent, and unprovoked assault on a steam engine, what can the engine do but invoke the God of Battle and snorting the defiance of Macbeth meet the assaulter head on."

[5] Finally, we would say that the evidence is insufficient to sustain the jury's finding assessing the damages at $1,000. Mr. Sokolski was not qualified to testify, either as to the market value of this bull or its intrinsic or actual value.

For the errors indicated, it becomes necessary to reverse and remand this cause for a new trial.